Nathaniel ANCHO, Plaintiff–Appellant,

v.

**PENTEK CORPORATION,**
Defendant–Appellee.

No. 97–1378.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 4, 1997.

Decided Oct. 6, 1998.

Paul W. Grauer (argued), Randall W. Graff, Edward A. Czapla, Grauer & Associates, Schaumburg, IL, for Plaintiff–Appellant.

Bradley B. Falkof (argued), Amy McKeever Toman, Oran F. Whiting, Brain W. Troglia, Barnes & Thornburg, Chicago, IL, for Defendant–Appellee.

Before POSNER, COFFEY and ROVNER, Circuit Judges.

COFFEY, Circuit Judge.

The plaintiff-appellant, Nathaniel Ancho ("Ancho"), appeals the trial court's order barring testimony from his expert witness and granting summary judgment in favor of the defendant-appellee herein, Pentek Corporation ("Pentek"). Ancho claims that the court committed reversible error in failing to properly articulate and apply the *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), standard for assessing the admissibility of expert testimony. We affirm.

## I. BACKGROUND

The Jefferson Smurfit Corporation employed Nathaniel Ancho as a process manager[1] at its Hanover Park, Illinois, corrugated cardboard production facility. The "Pentek Intelligent Automatic Car" ("PIAC") materials handling system, manufactured by the defendant, Pentek Corporation, moves finished board within the Jefferson Smurfit plant from a corrugator to a banding machine. As described, the PIAC consists of five fixed roller conveyors and an automatic transfer car. The transfer car moves along a rail running north-south set below the floor of the plant, while the top of the car is elevated above the floor. The transfer car is used to carry loads of corrugated board between the roller conveyors at the plant. The five roller conveyors are perpendicular to the car path (i.e., they run east-west). Two of the roller conveyors are located at the north end of the path of the car, and transfer bundles of finished product coming from the machine that fabricates the board, the corrugator, onto the transfer car. Another two roller conveyors are located at the opposite end (south) of the car path, and transfer finished cardboard product from the transfer car to the banding machines which in turn band the cardboard preparatory to shipping. These four roller conveyors, all running in an east-west direction, are located on the same side of the transfer car travel aisle. The remaining roller conveyor, located at the north end of the plant, is positioned on the opposite side of the transfer car travel aisle. This roller conveyor serves only as a temporary staging unit for "off quality" material.[2] An inspector stands to the side of the conveyors and examines the quality of the corrugated board. If a load of cardboard exiting the corrugator is deemed by the inspector to be "off quality," it is separated out and sidetracked onto the staging conveyor. On the other hand, if the cardboard passes the quality inspection, it is rolled down the conveyor from the corrugator and onto the transfer car. The transfer car, carrying cardboard, then moves from the north end of the plant to the south end, and stops at the two roller conveyors leading to the bander. The cardboard load is rolled off the transfer car and down the roller conveyors leading to the banders, where it is banded and readied for shipment. As the transfer car moves between the various conveyors at the plant, it passes through a number of "pinch points."[3]

The transfer car operates at speeds ranging from 0.45 miles per hour to three miles per hour and is powered with electricity. When the car is in motion, the warning system is activated and is equipped with a loud horn[4] as well as lights which flash to warn workers to stay clear of the track. There are numerous signs and red stickers placed on and about the roller conveyor and transfer car areas notifying workers of the risk of hazardous machinery and "pinch points." The area of the plant's floor across which the car operates is marked with yellow lines, and

1. A process manager is a supervisor who oversees the plant's machine operators.

2. "Off quality" material is corrugated board that had been improperly glued, was not stacked neatly for shipment, or was not cut properly into uniform sizes.

3. A "pinch point" is the one and one-half inch gap (space) between the end of the fixed steel frame of the conveyor line and the passing transfer car. This gap becomes hazardous if one's hands, arms, fingers or feet become entangled therein, for it is prone to catch, pull, pinch or crush portions of the human anatomy.

4. According to the testimony of the plaintiff, the noise of the horn was similar to that of a truck backing up.

the space between these yellow lines is covered with red paint to make workers aware of the car's area of operation. Moreover, electronic sensors are attached to the transfer car which automatically shut down the system whenever an object is detected traversing the path of the moving car.

On October 4, 1993, Ancho went to the staging roller conveyor to inspect some "off quality" corrugated board. Ancho initially performed his inspection duties while standing on one side of the conveyor, about one or two feet away from the transfer car travel aisle. According to testimony, while performing the inspection, Ancho moved to the other side of the conveyor, and proceeded to walk around the eastern-most end of the staging conveyor. In walking around the end of the conveyor, he came in contact with the transfer car as he negligently crossed into the car's travel aisle without paying attention to the fact that the car was traveling down the rail towards him. As the transfer car passed the end of the fixed steel frame of the staging conveyor line, Ancho's left foot, which was still in the transfer car travel aisle, became locked in the "pinch point" between the framework of the staging conveyor and the passing car. Ancho was injured, sustaining serious permanent damage to his left foot.

On October 2, 1995, Ancho filed this products liability tort action in the Circuit Court of Cook County, Illinois, against Pentek as the manufacturer of the PIAC. Pentek thereafter successfully moved under 28 U.S.C. § 1446(d) to remove the action to federal court based on the parties' diversity of citizenship.[5]

Prior to trial, Ancho retained an expert, Ronald Lobodzinski ("Lobodzinski"), who submitted a written report to the court on November 8, 1996, in compliance with Fed. R.Civ.P. 26(a)(2). In the report, Lobodzinski expressed his opinion that Pentek designed the PIAC in such a fashion that it failed "to eliminate the unreasonably dangerous pinch points where the transfer car passes by fixed components of the system" and "provide adequate safety devices to protect persons from the pinch points." Lobodzinski offered the following two alternative proposals which, in his opinion, Pentek could have employed to avoid the problems associated with the PIAC's pinch points:

(a) Eliminate the movable transfer car from the product.

(b) Provide safety devices at or near the pinch points such as electronic safety devices or mats which would sense when someone was near the pinch point and thereby stop the transfer car.

On November 13, 1996, Pentek deposed Lobodzinski regarding his qualifications and the nature of his investigation.

Having reviewed the deposition testimony, Pentek filed a motion *in limine* to bar Lobodzinski from testifying at trial, stating that Lobodzinski did not qualify as an expert as provided in the Supreme Court's opinion in *Daubert.* After briefing and argument on the motion, the trial court found that Lobodzinski was not qualified as an expert under *Daubert* and granted Pentek's motion barring Lobodzinski from testifying as an expert with a ruling from the bench on December 20, 1996, and at the same time the court granted Ancho leave to name a different (qualified) expert. Rather than take advantage of the opportunity to name a qualified expert (another witness), Ancho decided to re-submit Lobodzinski as his expert and requested that the court reconsider its prior *in limine* ruling of December 20 barring his witness. At the same time, Pentek filed a motion for summary judgment. The parties stipulated that, if the trial judge decided to bar Lobodzinski's testimony, Ancho would be unable to make out a *prima facie* case, and thus, the court could properly enter summary judgment in Pentek's favor. On January 27, 1997, following a second hearing on

---

**5.** Ancho is an Illinois resident. Pentek is a resident of Indiana—it was incorporated under the laws of that State, and has its principal place of business in Indianapolis, Indiana. *See Casio, Inc. v. S.M. & R. Co., Inc.,* 755 F.2d 528, 529 (7th Cir.1985) ("For purposes of federal diversity jurisdiction, a corporation is (with an immaterial exception) a citizen both of the state (or states) in which it is incorporated and the state in which it has its principal place of business.") (citing 28 U.S.C. § 1332(c)).

the *Daubert* issue, the court denied Ancho's motion to reconsider and reverse his prior ruling concerning the question of whether Lobodzinski was qualified to testify as an expert at trial. The court, pursuant to the parties' stipulation, granted Pentek's motion for summary judgment.

## II. ISSUE

This appeal presents us with one issue for review. We must determine whether the trial judge correctly articulated and applied the *Daubert* standard in granting Pentek's pre-trial motion to bar Ancho's expert witness from testifying at trial.

## III. DISCUSSION

■ This case comes to us on appeal from the district court's ruling barring Lobodzinski from giving expert testimony at trial due to his failure to satisfy *Daubert*. "It is well established that issues related to expert opinion testimony are matters of law to be determined by the trial judge." *Cella v. United States*, 998 F.2d 418, 422 (7th Cir.1993) (citing *Wallace v. Mulholland*, 957 F.2d 333, 336 (7th Cir.1992)). Initially, we review *de novo* the question of whether the court properly followed the *Daubert* framework. *See Bradley v. Brown*, 42 F.3d 434, 436 (7th Cir.1994). "Provided the district court adhered to *Daubert's* parameters, we will not disturb the district court's findings unless they are manifestly erroneous." *Id.* at 436–37 (citations omitted).

■ Rule 702 of the Federal Rules of Evidence, as interpreted by the Supreme Court in *Daubert*, governs the admissibility of expert testimony in federal courts.[6] This circuit has since interpreted *Daubert* as mandating that trial courts engage in a two-step inquiry when evaluating the admissibility of proffered expert testimony:

First, the district court must consider whether the testimony has been subjected to the scientific method; it must rule out subjective belief or unsupported specula-

tion. Second, the district court must determine whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue.

*Wintz v. Northrop Corp.*, 110 F.3d 508, 512 (7th Cir.1997) (citations and internal quotations omitted). Four non-exclusive "guideposts" are pertinent in assessing the reliability and validity of the expert's scientific methodology: "(1) whether [the expert's theory] can be and has been tested; (2) whether [his theory] has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) the general acceptance of the theory." *Bradley*, 42 F.3d at 437 (citing *Daubert*, 113 S.Ct. at 2796–97). Because the *Daubert* Court "emphasized that it did 'not presume to set out a definitive checklist or test,' and that the district judge's inquiry should be 'flexible,' " *United States v. Vitek Supply Corp.*, 144 F.3d 476, 485 (7th Cir.1998) (citation omitted), there is no requirement that the district judge consider each one of these "guideposts" when making an admissibility ruling under Fed. R.Evid. 702.

The gist of Ancho's argument is that the trial judge failed to articulate and properly apply the *Daubert* standard in barring Lobodzinski's testimony on December 20, 1996, as well as at the hearing on Ancho's motion for reconsideration from that ruling on January 27, 1997. We disagree. The record reflects that the court did in fact consider and follow *Daubert* when rendering its decision to bar Ancho's expert from testifying at trial, and that its ruling based on *Daubert* was not "manifestly erroneous."

### A. The Court Followed Daubert

■ Prior to trial, Ancho's expert witness, Lobodzinski, submitted his written report to the court in which he recommended that Pentek remove the PIAC and replace it with a fixed roller conveyor. After receiving Lobodzinski's report, and in advance of trial, Pentek deposed Lobodzinski and challenged

---

6. Specifically, Fed.R.Evid. 702 provides, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a wit-

ness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

his qualifications because, in Pentek's view, Lobodzinski "was unqualified to render opinions at trial in that he developed his opinions solely for the purposes of litigation." Based upon the testimony in deposition, Pentek filed the motion *in limine* to bar Lobodzinski from testifying at trial, believing that he did not qualify as an expert as set forth within the *Daubert* guidelines. At the time of the hearing on Pentek's motion *in limine*, the trial judge reviewed Pentek's supporting memorandum, which revealed that Lobodzinski had no expertise in plant design and that he had failed to observe the transfer car in operation, much less even take the time to visit the accident site. The trial court granted the motion after a hearing on December 20, ruling that "based on the arguments in this [Pentek's] memo on *Daubert*, I don't think there is a prayer of this fellow Lobazinski [sic] possibly overcoming the bar."

Pentek urges that this statement from the court is indicative of the court's intent to have "adopted Pentek's memorandum of law," in which Pentek addressed every part of the *Daubert* test step-by-step. While we are reluctant to say that the court's initial commentary on the persuasiveness of Pentek's memorandum rose to the level of "adopting" the analysis set forth within that document, taking into consideration that the judge specifically referred to the *Daubert* standard in granting Pentek's motion *in limine*, it is rather obvious that the trial judge did have the *Daubert* framework in mind during the hearing on December 20 and in particular when he rendered his oral decision. The court then proceeded to espouse, on what appears to have been a preliminary basis, what its reasons were as to why Lobodzinski did not "have a prayer" of qualifying as an expert in accordance with *Daubert*:

> [F]irst of all, he's not academic as such, not that you have to be. But, secondly, he renders opinions. He feels free to render opinions without even having seen the site or on some other site.... He appears to know nothing about these types of systems. He hasn't designed them. He hasn't even repaired them. He hasn't utilized them.

\*　　\*　　\*　　\*　　\*　　\*

> I don't think that this type of individual [a mechanical engineer] opining as he did, that they ought to abolish the transfer car, which in my opinion is no answer at all ... I mean, moving objects are dangerous, we all know that.

At this time, Ancho interrupted the discussion and stated that he would be "prejudiced" if the court decided to bar Lobodzinski from testifying so shortly before trial. While making this "prejudice" argument, Ancho continually reminded the judge that he was to make his ruling "under *Daubert*," and that "under *Daubert*, you [the judge] are the gatekeeper." The court responded by stating "[y]ou may indeed be prejudiced. But that doesn't qualify him [Lobodzinski]." Instead of countering that Lobodzinski was qualified, Ancho replied to the court's remark by requesting leave to name a different expert. After further colloquy, during which time Pentek reiterated that "Lobodzinski had opinions which were woefully inadequate under *Daubert*," Pentek's motion *in limine* was granted, and, on his request, Ancho was granted leave to retain and depose another qualified expert.

But strange as it may seem, even though Ancho had requested the court's permission to hire a new expert, he changed his mind, and instead decided to continue with Lobodzinski as his expert. Thus, Ancho filed a motion asking the court to reconsider its prior *in limine* ruling barring Lobodzinski from testifying. The court conducted a hearing on this motion on January 27, 1997. At the commencement of the hearing, the parties stipulated on the record that, if Ancho's motion to reconsider was denied, he (Ancho) would be unable to establish a *prima facie* case, and the court could properly enter summary judgment in Pentek's favor. Counsel for Pentek thereafter presented its arguments as to why Lobodzinski was not qualified as an expert under the *Daubert* standard:

> Your Honor knows well under *Daubert* that you have certain gatekeeping functions, and *Daubert* tells us in four steps what this court is to do. Plaintiff's expert essentially does not provide any support under any one of the four elements of

*Daubert.* First of all, there has to be some verification by the scientific method through testing. Point blank, plaintiff's expert did not [sic] testing.... [H]e didn't even go out to the plant before rendering his opinions.

The trial judge then interposed, acknowledging that pre-*Daubert* authority, *Viterbo v. Dow Chemical*, 826 F.2d 420 (5th Cir.1987), allowed the court to "reject an opinion if it is convinced that the expert reached its conclusion before he had ... the opportunity to look at the thing in question or the conveyor, or cart system that is involved in this case." Pentek proceeded to address the remaining three *Daubert* elements:

In the final analysis, there is nothing to work with here in terms of has his—his opinions been subjected to peer review. The problem is, there is nothing to review because he hasn't told us with any degree of particularity what it is he's recommending. The third element of the *Daubert* requirements is that the opinion has to be evaluated in light of the potential rate of error of the scientific techniques. You can't do it here.

\*     \*     \*     \*     \*     \*

And then, finally, you have to ask whether it is consistent with generally accepted methods of gathering relevant scientific evidence.

During Ancho's subsequent presentation of his arguments in response to Pentek, the court repeatedly referenced the *Daubert* decision by name,[7] but did not specifically articulate the four "guideposts" word-for-word. The trial judge ultimately denied Ancho's motion for reconsideration from the bench based on two premises, which are unquestionably grounded in *Daubert* and Fed. R.Evid. 702. Initially, at the conclusion of the hearing on January 27, 1997, the trial judge found that Lobodzinski's statement that transfer cars be eliminated would be "*of*

*no help to the jury*" in the absence of adequate reasoning or explanation (emphasis added). There is nothing in the record that would cause us to believe that Lobodzinski presented any architectural designs or materials to illustrate his proposals. Furthermore, as previously stated, the judge pointed out that Lobodzinski had failed to observe the transfer car in operation, much less visit the accident scene, nor had Lobodzinski ever observed any similar conveyor system. And secondly, the judge was of the opinion that even though Lobodzinski was a graduate mechanical engineer, he was unqualified as an expert as he was without any experience in the field of architectural design relating to plants of this nature, nor was he familiar with the operation of this type of conveyor system. Furthermore, the judge was not impressed with Lobodzinski's simplistic recommendation and conclusion that the transfer car should be removed.[8] In fact, if Pentek were to follow Lobodzinski's proposal, Jefferson Smurfit would be required to reconfigure the entire plant floor to accommodate an aboveground, permanent conveyor running from the north end of the facility to the south end (i.e., from the corrugator to the banding machine). According to Lobodzinski's proposal, any employees who move in and around the roller conveyor area, as well as machinery, such as a forklift, that currently travels freely through, or stands in the way of, the location of the proposed fixed-conveyor would have to be re-routed around the conveyor or moved elsewhere.

As we made clear earlier in the decision, although the judge referred to the *Daubert* standard during his oral ruling, he did not specifically mention the four guideposts used to assess the reliability and validity of an expert's scientific methodology. Obviously, it would have been more helpful for us on review if he had articulated in detail the application of his ruling to the witness's lack of qualifications *vis a vis* the *Daubert* stan-

---

7. By our count, the parties and court referenced the *Daubert* case by name no less than thirteen times through the course of the January 27 hearing.

8. Lobodzinski opined that the PIAC could have been installed as a fixed-conveyor system in the Jefferson Smurfit facility. A fixed-conveyor system would presumably eliminate use of the transfer car and, in turn, the "pinch points" created by the movement of the car past the fixed conveyors of the PIAC.

dard. However, when the trial judge's decision is read in totality, we deem it to be sufficiently clear that he very definitely relied on the *Daubert* standard when rendering his oral ruling. Furthermore, we all understand that oral rulings are not as formalistic, definitive, and specific as written ones. Trial judges need only follow (i.e., adhere to) *Daubert* when making a Fed.R.Evid. 702 determination, *see, e.g., Bradley,* 42 F.3d at 436; they are not required to recite the *Daubert* standard as though it were some magical incantation. Here, the trial judge granted Pentek's motion *in limine* to bar Lobodzinski from testifying, and thereafter rejected Ancho's motion for reconsideration of that ruling after he found during a hearing that Lobodzinski, a graduate mechanical engineer, neither possessed the requisite expertise, knowledge and/or experience to render a qualified opinion about redesigning Jefferson Smurfit's plant, nor would Lobodzinski's testimony have assisted the jury at trial. As this Court very recently explained in *Vitek*:

> [W]e have no doubt that an expert's qualifications bear upon the scientific validity of his expert testimony. In *United States v. Benson,* 941 F.2d 598 (7th Cir.1991), we stated, "An expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion; the opinion must be an expert opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert." *Id.* at 604. *Because an expert's qualifications bear upon whether he can offer special knowledge to the jury, the Daubert framework permits—indeed, encourages—a district judge to consider the qualifications of a witness.*

144 F.3d at 486 (emphasis added).

**B.** *The Court Properly Applied Daubert In Barring Lobodzinski's Testimony*

■ Since we have concluded that the trial judge adhered to *Daubert*'s parameters, we will not disturb a trial court's findings unless they are "manifestly erroneous." *See Bradley,* 42 F.3d at 436–37 (citations omitted). In *Wintz,* 110 F.3d at 512, we held that this standard of review affords the district courts "*wide latitude and discretion* when determining whether to admit expert testimony," provided they follow the *Daubert* "methodology." (emphasis added). We are confident that the court did not overstep the bounds of its discretion in this case.

As the record reflects, Lobodzinski's suggestion was to remove the transfer car from the PIAC and rely solely on fixed conveyors to transport finished corrugated board from the corrugator to the banding machine. In other words, it would necessitate the installation of an above-ground, permanent roller conveyor running from the north end of the plant to the south end. Although Ancho testified that the roller conveyors at the plant are constructed approximately one foot off the ground, the conveyors are in essence made up of rows of rotating, wide, steel rods in the shape of metal piping. These fixed tracks of piping move heavy loads of corrugated board around the plant. It is impossible for workers to cross over the conveyors because they are several feet in width and are constantly in motion. The alleged expert Lobodzinski's proposed fixed-conveyor system is replete with problems in that it would in effect act as an obstructive north-south fence cutting through the middle of the Jefferson Smurfit facility, thus effectively cutting off access for forklifts and other vehicles conveying materials from the west to the east side of the plant. The fixed-conveyor proposal would force plant operators to construct new exits for workers to escape in the event of any serious problem on the production floor, such as a fire or explosion. Otherwise, workers might very well be blocked from access to exits located only a few feet away, but on the opposite side of the conveyor. Furthermore, newly redesigned machinery, the type or capability of which Lobodzinski failed to identify, would have to be purchased to make way for the fixed conveyor, and existing machinery would in all probability have to be moved to other locations in the plant, all at possibly increased cost to Jefferson Smurfit. We raised other concerns at oral argument, and on one occasion, queried Ancho's attorney, "How do people get from one side [of the conveyor] to another?" He responded only by stating, "That's the problem." Indeed, that is the problem,

one which Lobodzinski's recommendation not only fails to address, but one for which he is not qualified to provide an expert opinion. In fact, as we made clear earlier in our opinion, he did not even see fit to visit the accident scene, including the conveyor in question, to familiarize himself with the problem at the Jefferson Smurfit facility before reaching a conclusion and recommending that the PIAC be replaced by a fixed-conveyor system, much less take the time to draft an alternative design for the PIAC. Thus, we have great doubt that he had any way of knowing whether it would have been feasible to eliminate the transfer car. *See id.* (toxicologist unqualified to render expert opinion about whether newborn infant's ailments resulted from mother's exposure to bromide while pregnant because, among other things, at the time expert formed his opinion, he had neither spoken with the mother nor reviewed infant's medical records). Based upon this record, we agree with the learned trial judge's assessment that Lobodzinski did not possess the requisite qualifications to render an opinion as to the feasibility of installing a fixed-conveyor materials handling system at the Jefferson Smurfit plant. Just as a qualified and board certified heart surgeon does not possess sufficient knowledge of orthopaedic medicine to render an expert opinion on spine surgery, likewise we agree with the trial court's ruling that a mechanical engineer such as Lobodzinski lacks qualifications to give expert testimony about plant reconfiguration. *But see* 3 Jack B. Weinstein, et al., *Weinstein's Evidence* ¶ 702[04], at 702–61 ("[T]he wrong title may mean that the witness is nevertheless qualified ....") (cited in *Wintz*, 110 F.3d at 514). Ancho should have retained a qualified plant engineer to testify at trial and his failure to do so was a mistake in judgment for which he has no one to blame but himself.

▮ We also concur in the district court's finding that Lobodzinski's testimony would not assist the jury in understanding the evidence or determining a fact in issue. It is true that "the trial court is not compelled to exclude the expert just because the testimony may, to a greater or lesser degree, cover matters that are within the average juror's comprehension." *United States v. Hall*, 93 F.3d 1337, 1342 (7th Cir.1996). On the other hand, an expert, if he is to give testimony to assist jury members and expand their knowledge of the product and its capabilities in its specific manufacturing process, must testify to something more than what is "obvious to the layperson" in order to be of any particular assistance to the jury. *See, e.g., Schutt Mfg. Co. v. Riddell, Inc.*, 673 F.2d 202, 205 (7th Cir.1982) (If "the subject matter as a whole is obvious to a lay[person] ... expert testimony ... would be useless.") (citation omitted). In the case *sub judice*, Lobodzinski claimed that the PIAC was "unreasonably dangerous" due to the existence of so-called "pinch points" along the transfer car travel path. His answer to the problem—eliminate the "pinch points" by doing away with the transfer car. From our review of the record, we are confident that the nature of Lobodzinski's expert testimony would not have provided any assistance to the court or jury in understanding the problem or possible solution. The feasibility of implementing Lobodzinski's proposal is another matter—a jury would undoubtedly benefit from a qualified expert's opinion on whether the Jefferson Smurfit plant could be reconfigured in a safe, cost-efficient way to accommodate a fixed-conveyor materials handling system. But, as explained above, Lobodzinski's professed knowledge of, and expertise in, mechanical engineering, by itself, falls short of qualifying him as an expert to render an opinion with respect to redesigning Jefferson Smurfit's production facility.

## IV. CONCLUSION

We are of the opinion that the trial court's articulation and application of the *Daubert* standard was sufficient to bar Ancho's retained expert, Lobodzinski, from testifying at trial. And because the parties have stipulated that Ancho would be unable to make out a *prima facie* case in the absence of Lobodzinski's testimony, we likewise affirm the court's grant of summary judgment in Pentek's favor.

AFFIRMED.