Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/21/2017 08:07 AM CST

- 521 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

In re Interest of Elijah P. et al.,
children under 18 years of age.
State of Nebraska, appellee and cross-appellee,
v. Erika D., appellant, and Joshua P.,
appellee and cross-appellant.

___ N.W.2d ___

Filed February 21, 2017.    No. A-15-946.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings.
2. **Parental Rights: Rules of Evidence: Due Process.** In termination of parental rights hearings, the Nebraska Evidence Rules do not apply; instead, due process controls and requires that fundamentally fair procedures be used by the State in an attempt to prove that a parent's right to his or her child should be terminated.
3. **Parental Rights.** Neb. Rev. Stat. § 43-292(9) (Reissue 2016) allows for terminating parental rights when the parent of the juvenile has subjected the juvenile or another minor child to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse.
4. ____. Whether aggravated circumstances under Neb. Rev. Stat. § 43-292(9) (Reissue 2016) exist is determined on a case-by-case basis.
5. **Parental Rights: Words and Phrases.** Where the circumstances created by the parent's conduct create an unacceptably high risk to the health, safety, and welfare of the child, they are aggravated.
6. **Evidence: Words and Phrases.** Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved.
7. **Parental Rights.** Generally, a finding of aggravated circumstances under Neb. Rev. Stat. § 43-292(9) (Reissue 2016) is based on severe, intentional actions on the part of the parent.

- 522 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

8. ____. Neb. Rev. Stat. § 43-292(2) (Reissue 2016) provides that parental rights may be terminated when the parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection.

9. **Juvenile Courts: Rules of Evidence.** Juvenile courts must apply the Nebraska Evidence Rules at adjudication hearings.

10. **Trial: Expert Witnesses.** Once a party calls into question an expert testimony's factual basis, data, principles, methods, or their application, the trial court must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline, and the court does not have the discretion to abdicate its gatekeeping duty.

11. ____: ____. In performing its gatekeeping duty, a trial court has considerable discretion in deciding what procedures to use in determining if an expert's testimony satisfies the standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), but a necessary component of the trial court's duty is that when faced with such an objection, the court must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper.

12. **Trial: Expert Witnesses: Appeal and Error.** After a sufficient objection under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), has been made, the losing party is entitled to know that the trial court has engaged in the heavy cognitive burden of determining whether the challenged testimony was relevant and reliable and is entitled to a record that allows for meaningful appellate review.

13. **Trial: Expert Witnesses.** Without specific findings or discussion on the record, it is impossible to determine whether a trial court carefully and meticulously reviewed proffered scientific evidence or simply made an off-the-cuff decision to admit expert testimony.

14. ____: ____. In performing its gatekeeping duty, a trial court must explain its choices, and the record must include more than a recitation of the *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), boilerplate language and a conclusory statement that the challenged evidence is or is not admissible.

15. ____: ____. A trial court adequately demonstrates that it has performed its gatekeeping duty when the record shows (1) the court's conclusion whether the expert's opinion is admissible and (2) the

- 523 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
24 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

reasoning the court used to reach that conclusion, specifically noting the factors bearing on reliability that the court relied on in reaching its determination.

16. **Trial: Expert Witnesses: Appeal and Error.** An appellate court reviews the record de novo to determine whether a trial court has abdicated its gatekeeping function.

17. **Trial: Expert Witnesses.** *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), do not require that courts reinvent the wheel each time that evidence is adduced, and in such situations, a less extensive analysis and reasoning may be allowed.

18. **New Trial.** Only errors that are prejudicial to the rights of the unsuccessful party justify a new trial.

19. **Trial: Expert Witnesses.** Only if the admission or exclusion of the expert's testimony did not affect the result of the trial unfavorably for the party against whom the ruling was made will a court's abdication of its gatekeeping duty be deemed nonprejudicial.

20. **Juvenile Courts: Jurisdiction: Proof.** At the adjudication stage, in order for a juvenile court to assume jurisdiction of minor children under Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2014), the State must prove the allegations of the petition by a preponderance of the evidence.

21. **Juvenile Courts: Jurisdiction.** To obtain jurisdiction over a juvenile, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of Neb. Rev. Stat. § 43-247 (Cum. Supp. 2014).

22. **Juvenile Courts: Proof.** While the State need not prove that the juvenile has actually suffered physical harm, at a minimum, the State must establish that without intervention, there is a definite risk of future harm.

Appeal from the Separate Juvenile Court of Douglas County: CHRISTOPHER KELLY, Judge. Affirmed in part, and in part reversed and remanded for further proceedings.

Thomas C. Riley, Douglas County Public Defender, and Zoë R. Wade for appellant.

Donald W. Kleine, Douglas County Attorney, Amy Schuchman, Anthony Hernandez, and Shinelle Newman, Senior Certified Law Student, for appellee State of Nebraska.

Matthew R. Kahler, of Finley & Kahler Law Firm, P.C., L.L.O., for appellee Joshua P.

MOORE, Chief Judge, and RIEDMANN and BISHOP, Judges.

RIEDMANN, Judge.

## I. INTRODUCTION

Erika D. appeals and Joshua P. cross-appeals from the order of the separate juvenile court of Douglas County which adjudicated the parties' minor children under Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2014) and terminated Erika's and Joshua's parental rights as explained below. We affirm the adjudication, but for the reasons that follow, we reverse the termination and remand the cause for further proceedings.

## II. BACKGROUND

Erika and Joshua are the parents of five minor children: Joshua P., Jr. (Joshua Jr.), born in February 2006; Zion P., born in February 2008; Isaiah P., born in January 2013; Genesis P., born in November 2013; and Faith P., born in May 2015. Elijah P., born in February 2013, is the biological child of Joshua and another woman, but he had been under the care of Erika since October 2014.

The factual basis underlying the case occurred in January 2015 and is largely undisputed. At that time, the children, including Elijah, were residing with Erika. Joshua did not reside in the home, but he would see the children several times per week. On January 2, Elijah was standing on the armrest of the couch at Erika's house and fell off, landing face first on the floor, which was made of "vinyl covering tile" placed over concrete. He sustained a "knot" above his right eye that began to swell. Erika comforted Elijah and then called Joshua and sent him a photograph of Elijah's face by text message. Joshua told her to put some ice on the injury and keep Elijah awake for a while to monitor his condition. Elijah cried briefly but then acted normally—playing, eating, and drinking. When Joshua arrived at Erika's house a short while later, he talked

- 525 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

to Elijah and noticed nothing unusual about Elijah's behavior or demeanor. A few days later, Elijah began to develop a black eye from the fall, but otherwise there were no observable injuries or anything out of the ordinary about his behavior over the week following the fall.

On the evening of January 11, 2015, Erika fed the children dinner and gave them baths. She put the younger children, including Elijah, to bed around 8:30 p.m., and Elijah "went down easily." A little while later, she checked on him and noticed he was lying down, but his arms were straight up in the air. She pulled the covers off of him and called his name, but he did not wake up or put his arms down. Erika also noticed that he appeared to be stiff. She lowered Elijah's arms down, and then he relaxed and the stiffness went away.

Erika continued to watch Elijah, and a couple minutes later, he stiffened again. Erika then attempted to call Elijah's mother, and when there was no answer, she sent his mother a text message asking if he had ever previously experienced stiffness in his sleep. By this time, Elijah had relaxed again and looked like he was sleeping. Elijah's mother responded that Elijah "was super stiff especially in his legs" when he was born, but it had gone away, and she thought it was unusual that the stiffness had returned. After receiving the text message from Elijah's mother, Erika felt less concerned, because Elijah had experienced something similar in the past. Nevertheless, around 9 p.m., Erika called Joshua, told him about Elijah's stiffness, and asked him to come over.

On his way to Erika's house, Joshua searched the Internet for information on a 2-year-old experiencing stiffness while sleeping, and what he read was not alarming to him. The results of his search revealed that other children experienced stiffness in their sleep off and on—sometimes the parents were able to alleviate the condition and sometimes they were not, but by the next morning the children would be fine.

When Joshua arrived at Erika's house, he observed stiffness in Elijah's arms and legs and attempted to awaken him

- 526 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

by calling his name and touching him on the shoulder. Elijah's body then relaxed. Erika showed Joshua the text message from Elijah's mother reporting that Elijah had experienced stiffness when he was born. Because Elijah had previously experienced something similar, was breathing normally, and appeared to be sleeping, Joshua told Erika to let Elijah continue to sleep and see how he was in the morning when he woke up.

Joshua stayed at Erika's house for approximately an hour, and during that time, there was no indication that Elijah's stiffness had returned. When Joshua left Erika's house, he asked Erika to call him if anything changed or Elijah became stiff again and said if that happened, he would come back. Other than stiffness, Erika and Joshua did not observe any unusual body movements such as shaking, jerking, or signs of a seizure; Elijah's eyes were closed, and he seemed to be sleeping.

After Joshua left, Erika continued to monitor Elijah's condition throughout the night, but he did not experience any more stiffness overnight and appeared to be sleeping. She did not call Joshua because nothing concerning occurred overnight, and Elijah's condition did not change until around 8:30 a.m. the next day. After the older children left for school on the morning of January 12, 2015, Erika heard Elijah whining, so she thought he was awake and ready for breakfast. When she went to get him, she noticed his leg was stiff and one of his eyes was open, but he was not focusing or looking at her. She then called Joshua and asked him to take Elijah to the hospital.

When Joshua arrived, he observed the same symptoms Erika had reported, and he immediately took Elijah to the hospital. There, Elijah was diagnosed with a skull fracture above the right eye, a subdural hematoma, and a significant brain injury. He was taken into surgery to have the hematoma drained. Because of concerns that Elijah's injuries were the result of child abuse, the police and a child abuse pediatrician, Dr. Suzanne Haney, were called to the hospital.

- 527 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
24 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

A police detective responded to the hospital and spoke with Joshua, who recounted the events of January 2 and 11, 2015. The detective later met with Erika, and Erika reported the same version of events. Erika's and Joshua's stories remained consistent throughout numerous interviews. The police found no "hard evidence" indicating that Elijah's injuries were intentionally caused. However, in Dr. Haney's opinion, Elijah's injuries were the result of nonaccidental abusive head trauma, and thus, Erika and Joshua were arrested, and all of the children were removed from their care.

In various petitions, amended petitions, and supplemental petitions, the State sought adjudication of the children and termination of Erika's parental rights to Joshua Jr., Zion, Isaiah, Genesis, and Faith, and termination of Joshua's parental rights to Elijah, Joshua Jr., Zion, Isaiah, and Genesis. The State did not seek adjudication of Faith based on any acts of Joshua or termination of his parental rights to Faith.

In the operative pleadings, the State asserted that the children came within the meaning of § 43-247(3)(a), that reasonable efforts to preserve and reunify the family were not required because Elijah had been subjected to "aggravated circumstances," that termination of parental rights was warranted under Neb. Rev. Stat. § 43-292(2) and (9) (Reissue 2016), and that termination was in the children's best interests.

Prior to the juvenile court's holding an adjudication or termination hearing, Erika and Joshua filed a joint motion in limine asking that the court prohibit the State from introducing opinion testimony that Elijah's injuries were intentionally inflicted unless the court first established its reliability under the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001) (*Daubert/Schafersman*). Thus, the court held a *Daubert/Schafersman* hearing to determine the admissibility of Dr. Haney's opinion testimony. At the conclusion of the *Daubert/Schafersman* hearing, the juvenile court

- 528 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

determined that the testimony satisfied the requisite standards and was therefore admissible.

The adjudication hearing and termination hearing were held jointly over the course of 4 days in July and August 2015. At the hearing, Dr. Haney explained that in cases of abusive head trauma, the victims are usually infants who suffer a "sudden change in their level of consciousness" by way of either seizures or unconsciousness, and their injuries generally include an injury to the brain itself; bleeding around the brain, known as subdural or subarachnoid hemorrhages; retinal hemorrhages; and sometimes other injuries such as bruises or broken bones. The mere presence of a subdural hematoma or skull fracture is not indicative of abusive head trauma or child abuse, because the injuries could be the result of accidental trauma such as a car accident or a significant fall.

In Dr. Haney's opinion, Elijah's injuries were the result of two separate incidents. One incident occurring about January 2, 2015, caused the skull fracture above his right eye but did not cause any long-term consequences. In her opinion, a second incident of trauma occurred around the time he became symptomatic on January 11 and led to the subdural hematoma, brain injury, and seizures. She opined that the injuries were caused by separate incidents because they were located on opposite sides of the brain; the skull fracture was on the right side of Elijah's head, and the subdural hematoma was located on the left side of the brain. And in her experience, subdural hematomas resulting from a skull fracture occur directly underneath the fracture itself. In addition, Dr. Haney testified that the severity of Elijah's brain injury and subdural hematoma was not consistent with a short fall and that he would have begun to display symptoms within minutes to hours after sustaining an injury that caused the type of subdural hematoma he had. Thus, based on the history provided to her and the lack of any significant accidental trauma, Dr. Haney opined that the subdural hematoma and brain injury were the result of inflicted blunt force trauma.

- 529 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

Dr. Haney acknowledged that in terms of attempting to date the injuries, the skull fracture and subdural hematoma could have occurred at the same time. But because of the locations of the injuries, she believed they were two separate injuries. She also acknowledged, however, that it is possible that an impact on the right side of the head could result in a bruise or subdural hematoma on the left side of the brain. In Dr. Haney's experience observing skull fractures with subdural hematomas, she had never seen an "isolated opposite side subdural [hematoma]," but she admitted that the fact that she had not seen it did not mean it was not possible.

Other testimony at the hearing revealed that after the children were removed from Erika's and Joshua's care, they underwent medical evaluations. Zion was found to have seven cavities and two abscessed teeth. Otherwise, the children did not appear dirty and none of them had any untreated medical conditions. A pediatrician testified that he examined Isaiah in September 2013 when Isaiah was approximately 8½ months old. He noticed that Isaiah was not moving his eyes together and recommended to Joshua that Isaiah be seen by a pediatric ophthalmologist. The pediatrician followed up several times with Erika and Joshua, and when an appointment had not been made by November, the pediatrician called Child Protective Services, because he was concerned that Isaiah was at risk for vision loss. Erika and Joshua explained the delay in having Isaiah seen was due to Medicaid issues and Genesis' premature birth in November 2013. Isaiah was ultimately seen and underwent eye surgery in January 2014. Thus, the Child Protective Services intake was closed, because no safety risks were identified.

Genesis was born prematurely at 24 weeks' gestation. She had a "brain bleed" on both sides of her brain and was in the hospital for nearly 3 months. Pediatricians recommended early intervention services for Genesis, because she was at risk for developmental and learning problems due to her prematurity. When Genesis presented for her 6-month checkup, she was

- 530 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

developmentally delayed for a normal 6-month-old child, but she was doing things physically that were appropriate for a 3-month-old child; thus, she was developmentally on track for a child born as prematurely as she was. Erika acknowledged that additional services were suggested for Genesis, but because the pediatricians indicated that Genesis was developing on track when considering her prematurity, Erika understood that additional services were not necessary.

After the children were removed from Erika's and Joshua's care, Joshua Jr. and Zion began attending weekly appointments with a licensed mental health therapist. Both children were diagnosed with "adjustment disorder, not otherwise specified." The therapist explained that adjustment disorder occurs when children have experienced a disruption or significant change in their lives, which results in mild symptomology such as increased emotion, a bit of sleep disturbance, or increased "worried thoughts" that interfere in daily functioning. Joshua Jr.'s symptoms included worrying about Erika and Joshua, including what happened to them and if he was going to be able to see them, worrying about living in his foster home with a stranger, and worrying about Elijah. He was having some issues at school with attention and focus and some mild trouble following basic directions. Zion's symptoms included becoming "very emotionally dysregulated" at times, being overly sensitive to corrections, becoming very clingy, having mild trouble sleeping, and experiencing "worried thoughts." Like Joshua Jr., Zion expressed concern over her parents and Elijah. The trauma the therapist was addressing with the children was the trauma of being removed from their parents' care, which is a very traumatic and upsetting event, the injuries to Elijah, and some past events the children experienced, including Zion's reports that she used to get "whoopins" from Joshua. According to the therapist, the children are doing very well in therapy, have been very responsive, and have made significant progress.

- 531 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
24 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

Erika and Joshua both testified at the hearing and described the events that occurred on January 2 and 11, 2015. A transcript of text messages Erika and Joshua exchanged between January 12 and 19 was received into evidence. The messages begin with Erika's asking Joshua if Elijah had been examined at the hospital yet, and Joshua's response asking Erika to clean up the house. The following messages were then exchanged:

[Joshua:] They said he has a skull fracture and bleeding by his brain from when he [fell] off the couch

[Erika:] Oh no

. . . .

[Erika:] Is he going to be ok[?]

. . . .

[Joshua:] It[']s critical. He has to go to the ICU and he's on life support

[Erika:] [Oh my God] no

[Erika:] We should [have taken] him last night

[Erika:] I didn't even sleep because I was watching him

[Erika:] I can't believe this. From 8:30 to 9 . . . that's so crazy. He walked upstairs. I changed his [diaper,] we said good night [and] I love you[.] [Elijah and] Isaiah even said it to each other. Then I laid them down

[Erika:] I went to the bathroom and peeked to see if they were laying down and that's when I noticed that his hands were in the air

[Erika:] I can't believe this. Is this my fault? Should I [have] just taken him home[?]

[Joshua:] I thought about taking him. At first I thought he was just dreaming but then I googled what might have him doing that and everything I read said that some kids do that and they are fine when they wake up

[Joshua:] Then you told me [Elijah's mother] said that he has done it before so I didn't take him. I was going to tell her to ask the doctor about it at his next doctor's appointment because she said he has one soon

- 532 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
24 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

[Joshua:] If I thought it was anywhere close to this serious I would have [taken] him last night

[Erika:] It was a first for us both so we couldn't be 100% [sure] that there was something wrong

[Erika:] I cannot believe this

[Erika:] He seemed so fine. No crying. Dancing to [a movie] and playing with Joshua [Jr.] prior to dinner

[Erika:] This is crazy. What am I [going to] do? I can't believe there was something majorly wrong with him and I didn't know

[Erika:] What is his mom saying?

[Erika:] She's going to blame me for forever. I thought I was doing something good

. . . .

[Erika:] But he was hurting and I didn't even know

. . . .

[Erika:] Do you think you could go get my mom? She said [the police are] coming about 5:30 maybe but not sure but I'll need her here so I can talk with them and not be distracted by the kids

[Joshua:] [Yes]. Make sure you don't lie about anything. If the[y] ask you a question you don't know the answer to, say you don't know. Don't try to make up anything. No one did anything to try to hurt him and that's what matters.

The court also received into evidence video recordings of forensic interviews conducted of Joshua Jr. and Zion. In their respective interviews, the children described hearing Erika calling Elijah's name on the night of January 11, 2015, after Elijah had gone to bed and going into his bedroom and seeing his stiff arms up in the air. They explained that Elijah was not misbehaving that night and that Erika was not upset. They did not hear Erika yelling or Elijah crying when Erika put him to bed. Joshua Jr. said that when Erika would get upset with Elijah, she would yell or tell him to stop what he was doing. The children said that neither Erika nor Joshua ever hit Elijah

- 533 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

or "whooped" him. Joshua Jr. never saw Erika be mean to Elijah, and she treated him the same as she treated the other children. Zion confirmed that she has seen Erika kiss Elijah and tell him she loves him. Zion believed that Elijah's injuries were the result of his fall off the couch. Joshua Jr. indicated that he would disclose if Erika had hurt Elijah and that he would have told Joshua as well.

The juvenile court entered orders on September 10, 2015, finding that the State proved all of the allegations in the petitions and motions by sufficient evidence. The court therefore determined that the children came within the meaning of § 43-247(3)(a), that Erika's and Joshua's parental rights should be terminated pursuant to § 43-292(2) and (9), that no reasonable efforts were required, and that termination of parental rights was in the children's best interests. Erika timely appeals to this court, and Joshua cross-appeals.

### III. ASSIGNMENTS OF ERROR

Erika assigns, renumbered, that the juvenile court erred in (1) "abdicating its gatekeeping function under *Daubert*" by failing to set forth its reasoning for concluding that Dr. Haney's testimony was reliable, (2) implicitly finding that the scientific basis for Dr. Haney's opinion was "scientifically reliable under *Daubert*," (3) implicitly finding that Dr. Haney conducted a "reliable differential diagnosis," (4) finding that Erika subjected Elijah to aggravated circumstances under § 43-292(9), (5) finding that the children come within the meaning of § 43-292(2), (6) finding that termination of Erika's parental rights was in the children's best interests, (7) excusing reasonable efforts under Neb. Rev. Stat. § 43-283.01 (Reissue 2016), and (8) finding that the children come within the meaning of § 43-247(3)(a).

On cross-appeal, Joshua assigns that the juvenile court erred in finding (1) that the children come within the meaning of § 43-292(2) and (9), and (2) that termination of his parental rights was in the children's best interests.

## IV. STANDARD OF REVIEW

[1] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).

## V. ANALYSIS

### 1. Termination of Parental Rights

Under the procedural posture of this case, the adjudication hearing and termination hearing were held jointly. The juvenile court found the evidence sufficient to support both adjudication and termination, and Erika and Joshua challenge those decisions on appeal. We first address the termination of their parental rights.

### (a) *Daubert/Schafersman* Standards

[2] Erika's first two assignments of error challenge the juvenile court's decision to admit Dr. Haney's opinion testimony over her objection that the opinion was not reliable under the *Daubert/Schafersman* standards. In termination of parental rights hearings, the Nebraska Evidence Rules do not apply and, thus, neither do the *Daubert/Schafersman* standards. See *In re Interest of Rebecka P.*, 266 Neb. 869, 669 N.W.2d 658 (2003). Instead, due process controls and requires that fundamentally fair procedures be used by the State in an attempt to prove that a parent's rights to his or her child should be terminated. *Id.*

In *In re Interest of Rebecka P., supra*, the Nebraska Supreme Court determined that the father's due process rights were not violated by the testimony of a witness, because the father received notice of the termination hearing, he appeared at the hearing and was represented by counsel, and his counsel cross-examined the witness and raised several objections to the witness' testimony. The same is true in the present case. Erika received notice of the termination hearing and the fact that the State was planning to elicit an opinion from Dr. Haney as to

- 535 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

the cause of Elijah's injuries. Erika appeared at the hearing and was represented by counsel, who cross-examined Dr. Haney and objected numerous times during her testimony.

We also note that Erika received a continuance of the termination hearing in order to secure her own expert medical witness and later filed a motion asking for permission to take a trial deposition of an out-of-state expert she secured to rebut Dr. Haney's testimony. The State and guardian ad litem objected, and the juvenile court sustained the objection, thereby preventing Erika from presenting expert medical witness testimony at the hearing. Erika did not, however, assign the denial of her motion as error on appeal, and we therefore do not opine on whether this decision comports with fundamental fairness or the due process standards. We otherwise find that the due process requirements were satisfied and that the juvenile court did not err in allowing Dr. Haney's opinion for consideration on the motion to terminate parental rights. Because the rules of evidence do apply at adjudication hearings, we will address Erika's assignments of error with respect to *Daubert*/*Schafersman* in greater detail in the adjudication section below.

### (b) Statutory Grounds

In its order terminating Erika's and Joshua's parental rights, the juvenile court found by clear and convincing evidence that termination was warranted under § 43-292(2) and (9). Erika and Joshua challenge these determinations on appeal. Upon our de novo review of the record, we conclude that the evidence does not clearly and convincingly establish that Erika and Joshua neglected the children under § 43-292(2) or subjected them to aggravated circumstances under § 43-292(9). We first address the allegations of aggravated circumstances.

### (i) § 43-292(9)

[3] Section 43-292(9) allows for terminating parental rights when the parent of the juvenile has subjected the juvenile or another minor child to aggravated circumstances, including,

- 536 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

but not limited to, abandonment, torture, chronic abuse, or sexual abuse.

[4,5] Whether aggravated circumstances under § 43-292(9) exist is determined on a case-by-case basis. See *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). The Legislature has not defined "aggravated circumstances" in the juvenile code, but the Supreme Court cited with approval the New Jersey Superior Court, stating that where the circumstances created by the parent's conduct create an unacceptably high risk to the health, safety, and welfare of the child, they are "'aggravated.'" See *In re Interest of Jac'Quez N.*, 266 Neb. 782, 791, 669 N.W.2d 429, 436 (2003).

Because the juvenile court's order does not contain specific factual findings, it is unclear what aggravated circumstances the court found to exist in the case at hand. It appears the State alleged the existence of aggravated circumstances based on either Erika's alleged intentional causation of Elijah's head injuries or Erika's and Joshua's failure to timely seek medical attention for Elijah.

Upon our de novo review of the record, we conclude that the evidence does not clearly and convincingly establish that Erika intentionally caused Elijah's injuries. There do not appear to be any allegations that Joshua intentionally harmed Elijah, and the evidence is undisputed that Elijah's symptoms of a head injury began at a time when Joshua was not present and Erika was home alone with the children. Thus, our analysis as to any assertion of intentional, physical harm to Elijah concerns only Erika.

The only evidence presented at trial from which a finding of intentional abuse could be based is Dr. Haney's opinion that Elijah's brain injury and subdural hematoma were not caused by the fall from the couch. But she admitted that the height of the fall was not presented to her, and her records incorrectly indicated that he fell off a couch and hit his head on a table. The evidence was undisputed that Elijah fell off the couch on January 2, 2015, from a height of 28 inches, and landed on

- 537 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

his face on a floor made of "vinyl covering tile" placed over concrete. He immediately sustained a "knot" over his eye and ultimately developed a black eye. Dr. Haney opined that as a result of the fall, he suffered a skull fracture. Over the course of the next 9 days, however, Elijah was acting normally and did not appear to have any additional injuries.

The evening of January 11, 2015, was, by all witness accounts, uneventful, with the children eating dinner, taking baths, and getting ready for bed. Joshua Jr. and Zion confirmed that Elijah was not misbehaving that night and that Erika was not upset. The older children did not hear any loud noises, commotion, or crying when Erika put Elijah to bed, and Erika confirmed that he went to bed easily that night. The police detective agreed that other than Dr. Haney's opinion, there was no "hard evidence" that would indicate that Elijah's injuries were intentionally caused.

Furthermore, in general, there was no evidence presented that Erika physically disciplined any of the children or was physically abusive. She testified that she does not spank the children, and Joshua Jr. said that Erika does not spank them, but, rather, when the older children get in trouble, she disciplines them by taking away their toys or video games. There was some discussion surrounding a claim that Erika "pops" the children in the mouth. She explained that she does so if the children eat food off the floor and she wants them to spit it out because there are bugs in her apartment. She said it is not a form of discipline. Joshua Jr. and Zion said they have never seen Erika hit or hurt Elijah. Although Zion detailed an incident where Elijah got a "whoopin'" from Erika, she later described a "whoopin'" as Erika's slapping Elijah's hands with her hands. Zion said that it did not hurt Elijah and that he did not cry when Erika did so. Joshua Jr. stated that Erika treated Elijah the same as the other children, and Zion said she has seen Erika give Elijah kisses and tell him that she loves him. Joshua Jr. was asked whether he would tell the interviewer if Erika had hurt Elijah, and Joshua Jr. indicated

- 538 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

that he would and said that he would have told Joshua if Erika had hurt Elijah.

We also consider the text messages between Erika and Joshua sent after the January 2 and 11, 2015, incidents, as well as the inquiry Erika sent Elijah's mother on January 11. Our review of those messages reveals genuine concern and do not support a finding by clear and convincing evidence that Erika intentionally injured Elijah.

[6] Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *In re Interest of Josiah T.*, 17 Neb. App. 919, 773 N.W.2d 161 (2009). Although Dr. Haney's testimony could support a conclusion that Erika intentionally inflicted Elijah's injuries, when coupled with the circumstantial evidence presented at trial, the totality of the evidence does not rise to the level of clear and convincing in order to support a finding that Erika intentionally harmed Elijah. There is no evidence that Erika abused or neglected any children in the past or acted with any malicious intent the night Elijah became symptomatic. To the contrary, she not only cared for her own children, but she agreed to also care for Elijah, a child Joshua fathered with another woman. We note the absence of any motive or precipitating event that might have led Erika to intentionally harm Elijah. To the contrary, any loud crying or yelling likely would have been heard by Joshua Jr. and Zion, both of whom heard nothing that evening. In her forensic interview, Zion described hearing a noise she described as both a "boom" and a "bonk," but whether that occurred on January 11, 2015, or a different night is unclear, and regardless, at the time of the noise, Erika was downstairs with Zion, because Zion said Erika asked her to go upstairs to check on the younger children. When Zion investigated, all the children, including Elijah, were sleeping. In addition, the police found no hard evidence indicating that Elijah's injuries were intentionally caused, and the text messages Erika sent to Joshua and

- 539 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

Elijah's mother reveal genuine concern. Therefore, the totality of evidence presented at trial is not clear and does not produce a firm conviction that Erika intentionally harmed Elijah, resulting in significant head injuries.

In addition, we do not find that Erika's and Joshua's delay in seeking medical attention for Elijah constitutes aggravated circumstances. In *In re Interest of Jac'Quez N.*, 266 Neb. 782, 669 N.W.2d 429 (2003), the Supreme Court concluded that aggravated circumstances existed where the parents delayed seeking medical attention for 2 days when the child had suffered obvious, serious physical injuries. When the parents ultimately took the 2-month-old child to the hospital, he had a fracture to his right leg, severe cerebral palsy, retinal hemorrhages in both eyes, diffuse brain injury indicating lack of oxygen, and massive swelling of the brain tissue. The physicians found his injuries "consistent with child abuse, specifically, 'shaken baby syndrome.'" *Id.* at 784, 669 N.W.2d at 431. The parents denied harming the child, claiming that 2 days earlier he had fallen off the couch and struck his head against a telephone that was on the floor. The juvenile court ultimately terminated the father's parental rights under two subsections of § 43-292, including subsection (9), finding that he had subjected the child to aggravated circumstances. But the court determined that the State failed to meet its burden of proof as to the mother and declined to terminate her parental rights to the child. The State appealed.

The Supreme Court reversed, finding the evidence sufficient to also terminate the mother's parental rights under § 43-292(9). In reaching this decision, the court found that although the evidence did not tend to establish that the mother inflicted the initial injuries on the child, it clearly and convincingly established that she delayed seeking medical treatment for 48 hours after he had received obvious and serious injuries, thus severely neglecting his medical needs. It was undisputed that the child's injuries were obvious during the 48-hour delay, including the fact that he had a black and swollen eye, was

- 540 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
24 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

unresponsive during that time, was shaking, was not acting like himself, was not feeding well, was crying intermittently, was making some twitching movements, and had a change in consciousness. Thus, the Supreme Court found that it should have been apparent to the mother that the child had a serious physical problem, but she nevertheless refused to seek treatment for 2 days, apparently because she feared he would be taken from her.

Although *In re Interest of Jac'Quez N., supra*, appears factually similar to the present case, we find several important distinctions. First, the evidence in *In re Interest of Jac'Quez N.* was undisputed that the child's injuries were obvious and serious during the 48-hour period of delay. Here, according to Erika, Joshua, Joshua Jr., and Zion, Elijah was acting normally after he fell off the couch on January 2, 2015, until the night of January 11. Then, he appeared stiff and was unable to be awakened but displayed no other concerning symptoms, and Erika and Joshua believed he was sleeping. Erika and Joshua both stated that they became less concerned about the stiffness when Elijah's mother indicated he had experienced stiffness as a baby and that their concerns were additionally alleviated by Joshua's Internet research. As soon as Elijah's condition worsened the next morning, Erika called Joshua, who responded immediately and took Elijah to the hospital. Although Elijah was apparently suffering seizures throughout the night, Dr. Haney explained that the symptoms of a seizure can range from a simple "eye deviation [to] grand mal seizures where every extremity is jerking." She testified that Elijah's symptoms of episodes of stiffening and relaxing and unresponsiveness "could be" symptoms of a seizure. Thus, unlike in *In re Interest of Jac'Quez N.*, 266 Neb. 782, 669 N.W.2d 429 (2003), the evidence here is not clear and convincing that on the night of January 11, Elijah was displaying obvious signs of a serious medical issue, such as seizures, or that he needed immediate medical attention.

- 541 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

In addition, the parents in *In re Interest of Jac'Quez N., supra*, failed to seek medical attention for their child for 48 hours despite knowing there was something seriously wrong with him. In the present case, Erika and Joshua waited approximately 14 hours, while Erika continued to monitor Elijah's condition, and upon noticing a change, they immediately sought medical care. More importantly, in *In re Interest of Jac'Quez N.*, the parents admitted that they chose not to take the child to the hospital sooner because they were afraid he would be taken from them because of his black eye. Erika and Joshua both indicated that had they known something was seriously wrong with Elijah, they would have immediately taken him to the hospital, and they were not more concerned with his stiffness and unresponsiveness because of his history of similar actions and because he relaxed and appeared to be sleeping. There was no evidence that their delay in seeking medical treatment was intentionally done in an effort to protect themselves from suspicion or to avoid losing custody of Elijah.

[7] Generally, a finding of aggravated circumstances is based on severe, intentional actions on the part of the parent. See, *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012) (finding of aggravated circumstances based on single event of severe, intentional physical abuse); *In re Interest of Jamyia M.*, 281 Neb. 964, 800 N.W.2d 259 (2011) (aggravated circumstances existed where child suffered severe physical injuries through intentional abuse); *In re Interest of Hope L. et al.*, 278 Neb. 869, 775 N.W.2d 384 (2009) (finding of aggravated circumstances due to chronic abuse of parents' forcing children to repeatedly undergo unnecessary medical treatment, repeatedly disconnecting child's feeding tube, and failing to comply with medical advice and orders for child's treatment). Even in *In re Interest of Jac'Quez N., supra*, the parents delayed seeking medical attention for an obviously injured child because of their fear of losing him. In other words, their failure to timely seek medical care for their child was

- 542 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

a conscious, intentional decision made to protect themselves despite knowing he needed medical attention.

In the instant case, even if it should have been obvious to Erika and Joshua that Elijah needed medical attention on the night of January 11, 2015, Elijah's injuries are the result of their negligent conduct in failing to recognize his need for medical care, rather than a deliberate decision to forgo needed medical attention. The appellate courts of this state have not extended the meaning of aggravated circumstances to include a single act of negligent conduct leading to injury to a child, and we decline to do so now, particularly when the term "aggravated circumstances" has repeatedly been defined to include severe, intentional physical abuse. We therefore find that the evidence does not support terminating Erika's and Joshua's parental rights under § 43-292(9).

### (ii) § 43-292(2)

[8] The juvenile court also found that the State presented sufficient evidence to support termination pursuant to § 43-292(2). Section 43-292(2) provides that parental rights may be terminated when the parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection. The questions of what constitutes neglect and necessary parental care and protection are generally determined on a case-by-case basis. But we observe that none of the common factual patterns often found to establish neglect exist in the instant case, such as parental incarceration, see *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015); adjudication, involuntary termination, or relinquishment of previous children, see *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010); unsanitary house and unkempt children, see *In re Interest of Lisa W. & Samantha W.*, 258 Neb. 914, 606 N.W.2d 804 (2000); or addiction to drugs or alcohol, see *In re Interest of Joshua M. et al.*, 256 Neb. 596, 591 N.W.2d 557 (1999).

- 543 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

Here, the allegations of neglect apparently stem from not only the injuries to Elijah, but a failure to obtain proper medical care for the other children as well. Specifically, we understand the State to allege that neglect is established because Erika and Joshua failed to obtain medical care for Genesis' specialized needs, failed to timely obtain medical care for Isaiah's eye issues, failed to ensure two of the children were up to date on their vaccinations, and failed to obtain dental care for Zion.

The Supreme Court has previously found that two isolated instances in which a mother failed to provide medical care to a child, which did not result in serious injury to the child, were insufficient to support termination of the mother's parental rights. See *In re Interest of Angelica L. & Daniel L.*, 277 Neb. 984, 767 N.W.2d 74 (2009). There, the Supreme Court recognized and expressed concern over the mother's medical judgment but disagreed that such error in judgment warranted termination of her parental rights. The court reiterated that the law does not require perfection of a parent. *Id*.

Although the State sought to terminate the mother's parental rights under § 43-292(6) in *In re Interest of Angelica L. & Daniel L., supra*, we find the Supreme Court's rationale applicable in the present case. Under § 43-292(2), the State must establish that the parental neglect was substantial and continuous or repeated. We cannot find that a handful of incidents, none of which resulted in permanent or serious injury to any of the children, meet that threshold. This is particularly true when Erika and Joshua obtained eye surgery for Isaiah 4 months after he was referred to a pediatric ophthalmologist and explained that the delay was due to Medicaid issues and the premature birth of Genesis. Additionally, the record establishes that Erika and Joshua routinely took the children to the pediatrician for both illnesses and regular checkups, and the children were found to be healthy when they were removed from Erika's and Joshua's care. Erika testified that additional services were recommended for Genesis, but because the

- 544 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

pediatrician indicated that Genesis was developmentally on track when considering her prematurity, Erika did not believe such services were necessary. Accordingly, we find the evidence does not clearly and convincingly establish substantial and continuous or repeated neglect to support termination under § 43-292(2). As a result, the State has not proved statutory grounds for termination, and we therefore reverse the termination of Erika's and Joshua's parental rights to the minor children.

Because we find the State failed to establish statutory grounds for terminating Erika's and Joshua's parental rights, we need not determine whether termination was in the children's best interests or whether reasonable efforts at reunifying the family were required.

## 2. Adjudication

[9] Our inquiry does not end with our reversing the termination of Erika's and Joshua's parental rights, however, because the juvenile court also adjudicated the children under § 43-247(3)(a), a finding Erika challenges on appeal. The rules of evidence apply at adjudication hearings, and thus, we now address Erika's arguments with respect to the admissibility of Dr. Haney's opinion testimony for purposes of adjudication. See *In re Interest of Jordana H. et al.*, 22 Neb. App. 19, 846 N.W.2d 686 (2014) (juvenile court must apply rules of evidence during adjudication hearing).

### (a) *Daubert*/*Schafersman* Standards

Erika assigns that the juvenile court erred in abdicating its gatekeeping function by failing to set forth its reasoning for concluding that Dr. Haney's testimony was reliable. We agree.

Prior to trial, Erika and Joshua moved to prevent Dr. Haney from testifying as to her opinion of the cause of Elijah's injuries. They argued that Dr. Haney's testimony on abusive head trauma, otherwise known as shaken baby syndrome, was unreliable under the *Daubert*/*Schafersman* criteria. At

- 545 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

the conclusion of the hearing, the juvenile court denied the motion in limine from the bench, finding by clear and convincing evidence that the *Daubert*/*Schafersman* criteria had been satisfied and that the opinion testimony as to whether the head trauma injury Elijah sustained was nonaccidental and/or intentionally inflicted may be utilized by the State at trial. The court subsequently entered a written order containing the same language.

[10-13] The Nebraska Supreme Court has explained that once a party calls into question an expert testimony's factual basis, data, principles, methods, or their application, the trial court must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline, and the court does not have the discretion to abdicate its gatekeeping duty. See *Zimmerman v. Powell*, 268 Neb. 422, 684 N.W.2d 1 (2004). The trial court has considerable discretion in deciding what procedures to use in determining if an expert's testimony satisfies the *Daubert*/*Schafersman* standards, but a necessary component of the trial court's duty is that when faced with a *Daubert*/*Schafersman* objection, the court must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper. See *Zimmerman, supra*. This is so because after a sufficient *Daubert*/*Schafersman* objection has been made, the losing party is entitled to know that the trial court has engaged in the heavy cognitive burden of determining whether the challenged testimony was relevant and reliable and is entitled to a record that allows for meaningful appellate review. *Zimmerman, supra*. Without specific findings or discussion on the record, it is impossible to determine whether the trial court carefully and meticulously reviewed the proffered scientific evidence or simply made an off-the-cuff decision to admit expert testimony. *Id*.

[14-16] This requirement means the trial court must explain its choices, and the record must include more than a recitation of the *Daubert*/*Schafersman* boilerplate language and a conclusory statement that the challenged evidence is or is not

- 546 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

admissible. *Zimmerman, supra*. A trial court adequately demonstrates that it has performed its gatekeeping duty when the record shows (1) the court's conclusion whether the expert's opinion is admissible and (2) the reasoning the court used to reach that conclusion, specifically noting the factors bearing on reliability that the court relied on in reaching its determination. *Id*. When the court fails to make these findings, it abdicates its gatekeeping function. *Id*. An appellate court reviews the record de novo to determine whether a trial court has abdicated its gatekeeping function. *Id*.

The court, in *Zimmerman, supra*, found that the trial court abdicated its gatekeeping duty because the record contained only the court's conclusion but no analysis as to how the expert's testimony at the *Daubert*/*Schafersman* hearing was sufficient to show that the underlying methodology and the manner in which it was used was reliable. Likewise, in the present case, the juvenile court's ruling did not explain why Dr. Haney's testimony was reliable and met the *Daubert*/*Schafersman* standards. The court's oral ruling from the bench and its written order indicated only that the *Daubert*/*Schafersman* standards had been met and that therefore the testimony was admissible, but the court failed to detail how the methodology underlying Dr. Haney's opinion was reliable, particularly when Erika and Joshua argued that the methodology has recently been called into question by other medical experts. Because the juvenile court failed to explain its reasoning, we find that it abdicated its gatekeeping duty.

[17] We recognize that "*Daubert* . . . does not require that courts reinvent the wheel each time that evidence is adduced . . . ," *Schafersman v. Agland Coop*, 262 Neb. 215, 228, 631 N.W.2d 862, 874 (2001), and that our courts have previously accepted expert testimony regarding "shaken baby syndrome," see *State v. Leibhart*, 266 Neb. 133, 143, 662 N.W.2d 618, 627 (2003). In such situations, a less extensive analysis and reasoning may be allowed. See *State v. Mason*, 271 Neb. 16, 709 N.W.2d 638 (2006). However, the court is still required to set

- 547 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

forth its reasoning in more than conclusory fashion when ruling on a *Daubert*/*Schafersman* motion. As our Supreme Court noted when considering adoption of such a standard,

> [while] *Daubert* does not require that courts reinvent the wheel[,] it does permit the re-examination of certain types of evidence where recent developments raise doubts about the validity of previously relied-upon theories or techniques. In other words, once an issue is determined under *Frye*, it is closed to further *Frye* analysis because it is no longer "novel." *Daubert*, on the other hand, permits re-examination of the issue if the validity of the prior determination can be appropriately questioned.

*Schafersman*, 262 Neb. at 228, 631 N.W.2d at 874.

Because Erika and Joshua were questioning the continued validity of "shaken baby syndrome," the absence of the court's reasoning is all the more important.

[18,19] Having determined that the court erred in failing to perform its gatekeeping duty, we must determine whether the error prejudiced Erika and Joshua because only errors that are prejudicial to the rights of the unsuccessful party justify a new trial. See *Zimmerman v. Powell*, 268 Neb. 422, 684 N.W.2d 1 (2004). When a trial court fails to make the requisite findings, the losing party will usually be prejudiced. *Id*. Only if the admission or exclusion of the expert's testimony did not affect the result of the trial unfavorably for the party against whom the ruling was made will a court's abdication of its gatekeeping duty be deemed nonprejudicial. *Id*.

Here, the State sought to adjudicate the minor children under § 43-247(3)(a) based, in part, on Dr. Haney's opinion that Elijah's injuries were nonaccidental. The juvenile court apparently agreed, because it found the evidence sufficient to find that the children came within the meaning of § 43-247(3)(a). We therefore cannot say that the admission of Dr. Haney's testimony did not affect the result of the trial. Accordingly, the testimony should not have been admitted for adjudication purposes.

- 548 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

(b) Adjudication Under § 43-247(3)(a)

The allegations of the petition upon which adjudication was sought under § 43-247(3)(a) as to Elijah included that he presented to the hospital on January 12, 2015, with certain injuries; that he was in the care and custody of both Erika and Joshua at the time the injuries occurred; and that neither Erika nor Joshua could provide a plausible explanation for the injuries.

Although we determined above that it was error to admit Dr. Haney's testimony because the trial court failed to set forth its reasons under *Daubert*/*Schafersman* protocol, the testimony elicited at trial from the police supported the allegation of the petition that the children lacked proper parental care by reason of the fault or habits of Erika in that she did not provide a plausible explanation for Elijah's injuries. A police detective testified without objection that medical personnel indicated to her that Elijah suffered two separate injuries and that the second injury causing the brain bleed was nonaccidental. Based on that information, the detective determined "that there was something else going on." Erika was consistent in her interviews and at trial that she did not know what happened to cause this injury.

[20-22] At the adjudication stage, in order for a juvenile court to assume jurisdiction of minor children under § 43-247(3)(a), the State must prove the allegations of the petition by a preponderance of the evidence. *In re Interest of Anaya*, 276 Neb. 825, 758 N.W.2d 10 (2008). The court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247(3)(a). *In re Interest of Anaya, supra*. While the State need not prove that the juvenile has actually suffered physical harm, at a minimum, the State must establish that without intervention, there is a definite risk of future harm. *Id*.

Based on the testimony that Elijah's brain bleed was non-accidental and Erika's inability to explain the cause, the

- 549 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
24 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

juvenile court did not err in finding by a preponderance of the evidence that Erika failed to provide a plausible explanation for Elijah's injury, supporting the allegation that the children lacked proper parental care by reason of the fault or habits of Erika.

While this basis is sufficient to adjudicate the children, for purposes of completeness, we address the remaining allegations of the petition upon which adjudication was based. These allegations included a failure to obtain (1) proper medical care for Genesis' specialized needs, (2) proper medical care for Isaiah's eye issues, (3) proper medical care for the children because they were not up to date on their vaccinations, and (4) proper dental care for Zion. We find these bases insufficient to support adjudication.

In *In re Interest of Anaya, supra*, the Nebraska Supreme Court found that the parents' failure to submit their infant to mandatory blood testing did not, standing alone, establish neglect to warrant adjudication under § 43-247(3)(a). There, the court recognized that while the State need not prove that the juvenile has actually suffered physical harm, at a minimum, the State must establish that without intervention, there is a definite risk of future harm. The court found no evidence establishing that the parents had neglected the child; to the contrary, the evidence indicated that although the parents refused to submit the child for required testing, they were otherwise meeting his needs and he was a healthy baby. As such, the State failed to establish that this was an emergency situation, that harm was imminent, or that continued detention of the child was warranted. *Id.*

Similarly, in the present case, the evidence does not prove that harm was imminent or that the children are at a definite risk of future harm based upon these other allegations. Erika and Joshua obtained eye surgery for Isaiah 4 months after the pediatrician recommended he be examined by a pediatric ophthalmologist and explained the reasons for their delay. In addition, Erika explained that based on the pediatrician's

- 550 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF ELIJAH P. ET AL.
Cite as 24 Neb. App. 521

opinion that Genesis was developmentally on track for a premature baby, she did not believe extra services were necessary. Even Dr. Haney testified that Zion's cavities raise concern as to the type of dental care she was receiving, but it is not necessarily unusual for a 7-year-old child to have cavities. After the children were removed from Erika's and Joshua's care, they were examined and found to be healthy children with no untreated medical conditions. And the record establishes that Erika and Joshua regularly take the children to a pediatrician for illnesses, checkups, and vaccines. Accordingly, we cannot find that the minimal evidence presented here as to a lack of medical care rises to the level necessary to adjudicate the children under § 43-247(3)(a).

## VI. CONCLUSION

We conclude that the State failed to prove by clear and convincing evidence that termination of the parental rights of Erika and Joshua is warranted under § 43-292(2) or (9). We therefore reverse the juvenile court's decision terminating their parental rights. We also conclude that the juvenile court erred in failing to explain its reasoning for determining that Dr. Haney's testimony meets the *Daubert*/*Schafersman* standards. We affirm, however, the adjudication of the children, and we remand the cause for further proceedings.

Affirmed in part, and in part reversed and
remanded for further proceedings.